IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| JERRY W. JAMES, JR. | ) | |
| | ) | |
| Petitioner, | ) | Cause No.: |
| | ) | |
| v. | ) | |
| | ) | **Equitable Relief Sought** |
| THE CITY OF PEORIA | ) | **JURY TRIAL DEMANDED ON** |
| | ) | **ALL COUNTS** |
| | ) | |
| SERVE: City of Peoria | ) | |
| C/O Chrissie Kapustka, Deputy Corp. Counsel | ) | |
| 600 SW Adams Street | ) | |
| Peoria, Illinois 61602 | ) | |
| | ) | |
| Respondent. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Jerry W. James, Jr. ("Plaintiff" or "James"), by and through undersigned counsel, states as follows for his Complaint against the City of Peoria:

## PARTIES, JURISDICTION, AND VENUE

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq.* as amended by the Civil Rights Act of 1991 ("Title VII"), the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. §1983, §1988.

2. The City of Peoria is a body politic within the State of Illinois and the Central District of Illinois. The City of Peoria Police Department ("PPD" or "Defendant") is an accredited agency through the Commission on Accreditation for Law Enforcement Agencies with over 195 sworn members and 25 professional staff with its principal place of business at 600 SW Adams Street, Peoria, Peoria County, Illinois 61602.

3.  At all times relevant to this Complaint, Plaintiff was a resident of Peoria, Peoria County, Illinois , and Defendant employed James as a police officer.

4.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 because it arises under Title VII, the Fourteenth Amendment, and 42 U.S.C. §1983, §1988.

5.  Venue is proper in this division pursuant to 28 U.S.C. §1391(b)(2) and 42 U.S.C. §2000e-5(f)(3) because the violations complained of occurred in the Central District of Illinois and a substantial part of the events or omissions giving rise to the claim occurred in Peoria County.

6.  Plaintiff timely filed charges with the Equal Employment Opportunity Commission, received Notices of Right to Sue and fulfilled all administrative prerequisites under Title VII prior to filing his Complaint. (Attached as Group Exhibit A).

7.  These claims are filed within ninety days of receipt of Notices of Right to Sue and the Complaint is timely filed.

## FACTS COMMON TO ALL COUNTS

8.  James is an African American male.

9.  James was hired as a Patrol Officer by the Peoria, Illinois Police Department in March of 2016.

10. In 2020, James was promoted to a Special Unit in the Department as a Resident Police Officer.

11. As a Resident Police Officer, James was housed in a high crime neighborhood and worked as a community liaison to improve community-police relations and worked directly with politicians and community stakeholders to achieve this result.

12. James was one of five officers serving in the Resident Police Officer role in Peoria and the only minority in this role at the time of his discriminatory termination.

13. James received annual evaluations that rated his job performance as meets or exceeds standards.

14. In or about August of 2021, James was notified of an investigation against him by the Illinois State Police Department ("ISPD") related to allegations of sexual misconduct levied by the current husband of an ex-girlfriend.

15. The ISPD conducted a full investigation and ultimately no wrongdoing was found, the allegations were unfounded, no adverse action was taken or recommended against James, and no criminal charges were filed against James.

16. Despite the ISPD finding the allegations against James unfounded and taking no adverse action against James, the PPD subsequently opened its own investigation into the same allegations which ultimately resulted in James' discriminatory termination on January 24, 2022.

17. The pretextual reasons given for Petitioner James termination were improper use of the ADSI local criminal database for personal reasons, failure to act when he was off-duty, and dishonesty in the PPD investigation interview.

18. The PPD investigation process was a mere sham and the outcome was predetermined before it started; namely, to establish pretextual reasons for Mr. James' race-based termination.

19. James experienced years of discriminatory and harassing treatment by the PPD prior to his termination based on his race.

20. Other similarly situated white employees of the PPD, guilty of the same or worse conduct which James was falsely accused as pretext for his race-based termination, received minor or no discipline and/or were not terminated because of their misconduct.

21. Despite the pretextual reasons given for Petitioner James termination, he was terminated

because he is an African American and his termination was discriminatory in violation of Illinois

state and Federal laws.

## PATTERN OF DISCRIMINATION AND HARRASSMENT

22. The PPD has a notorious and ugly history of race discrimination that has been public and

well documented in recent years.

23. From the date of his hire in March of 2016, James quickly discovered that there

were a separate set of rules and higher scrutiny for African American officers as opposed to his

white colleagues.

24. Throughout his tenure with the PPD, Petitioner James was routinely targeted for

discipline or negative contacts for occurrences that his similarly situated white colleagues were

not.

25. It became obvious and apparent to James that the "old boys' network" of senior white

police officers at PPD frequently targeted minority officers for undeserving discipline and

protected other white officers from discipline or adverse employment actions for similar acts of

misconduct or alleged misconduct.

26. As an example, James was given a negative contact/write-up in 2018 for working

someone else's shift as a favor on his day off.

27. Similarly, James received a Letter of Reprimand in 2019 in relation to a wellness check

he performed from a white supervisor- when he questioned an African American supervisor in

his chain of command about this and explained what happened, the supervisor said James did

more than most people would have done at a wellness check and ripped up the Letter of

Reprimand.

28. As an African American officer, James was routinely scrutinized, criticized, and made to

feel unwelcome at the PPD firing range by white officers and superiors.

29. When assigned to the Neighborhood Services Unit, James' time was more closely scrutinized compared to white officers- he was chastised for use of two sick days despite documented illnesses and was instructed to use "flextime" instead of sick days. At a later meeting, the use of "flextime" was discussed and none of the white officers had been instructed by the shared supervisor in the use of "flextime" versus sick days as James had been.

30. As a Resident Police Officer, James was provided housing in a high crime area in a building he shared with co-tenant business owners.

31. A co-tenant in the building where James lived was told by the acting PPD Chief and another PPD officer they were "watching" James with the intent of finding reasons to terminate him.

32. On several occasions during his service as a Resident Police Officer, James learned of rumors circulating about him within the PPD regarding alleged illegal conduct, his private romantic relationships, and a scheme to remove him by PPD because of his race.

33. James was ordered by a PPD Chief to rewrite a report about an incident he was involved in to indicate James was the lead officer (he was not) and to include a statement about James' "use of force" during the incident.

34. James had not engaged in any "use of force" while two white officers on the scene had- yet the Chief ordered James to indicate he (not the white officers) had engaged in use of force which would have subjected James to a review by the Use of Force Board instead of the white officers.

35. James was passed over for a promotion as a Field Training Officer even though he had more seniority and experience than other white applicants.

36. .At that time there were no African American Field Training Officers and it was widely believed that certain white Field Training Officers routinely attempted to fail black recruits to prevent them from becoming officers.

37. When James requested a meeting to discuss why he was passed over for this position despite his seniority and experience, no explanation was given as to why James was rejected for the position.

38. A white Patrol Officer asked James' then girlfriend, who was white, why "she was down here working with these N*****s;" this incident was reported to a PPD Chief and the City Manager of Peoria but no action was ever taken.

39. James was routinely questioned about where he lived by white officers and how he was able to afford to live in that neighborhood and it was suggested he was engaged in illegal conduct to earn additional money.

40. James was routinely harassed and teased about his participation in interracial romantic relationships and, as noted in paragraph 38, at least one white officer made racial comments to a white girlfriend of James.

41. Despite numerous examples of exemplary service and verbal "attaboys" and praise from James' white superiors during his time as an officer with the PPD, James never received a "positive" contact on record as part of his official personnel file- even though every other white officer in his academy class received positive contacts in their official files during their shared time with PPD for conduct like James'.

42. Each of these instances amount to improper discriminatory action against James by the PPD and, taken as a whole, evidence a pattern of discriminatory conduct and harassment of James due to his race.

## ISPD INVESTIGATION

43. Sometime in July of 2021, a complaint was filed against James by the then-husband of James' ex-girlfriend. In the complaint, the husband alleged James sexually assaulted the woman while she and James were dating.

44. As a result of the complaint, the Interim PPD Chief requested that the Illinois State Police Department investigate the allegations.

45. Petitioner James gave a recorded statement during the ISPD investigation and ultimately was cleared of any wrongdoing and no adverse action was recommended.

46. At no time prior to his interview/recorded statement was James' notified of the nature of the investigation or what he had been accused of.

47. At the recorded statement/interview, for the first time, James was notified that the complaint was of a personal criminal nature- specifically an allegation by the current husband of a woman he had dated approximately one year before.

48. During the interview, James was questioned extensively about the nature and extent of his consensual relationship with his ex-girlfriend and whether James had ever used the local PPD criminal database system (ADSI) to look up information about his ex-girlfriend or her residence.

49. After the investigation was concluded, the Peoria County States Attorney's Office declined to prosecute any claims based on the unfounded allegations against James on October 29, 2021.

50. Upon information and belief, the State's Attorney elected not to pursue any criminal prosecution because James' ex-girlfriend admitted to the consensual nature of their relationship, denied any sexual misconduct, and witnesses corroborated James' account of the relationship.

## SUBSEQUENT PPD INVESTIGATION AND TERMINATION

51. On November 1, 2021, immediately after the State's Attorney elected not to prosecute any criminal charges against James related to the allegations against him, the PPD Assistant Chief filed a formal complaint against James related to the allegations which resulted in a PPD investigation of James.

52. PPD only opened its own investigation after it learned that the ISPD was not going to take or recommend adverse action against James and the State's Attorney would not pursue criminal charges.

53. As part of the PPD investigation, James was again asked to give a recorded statement where he was questioned extensively by internal affairs in December of 2021.

54. At that interview, the investigator had the benefit of the transcript of James' ISPD recorded statement; but James was not allowed to see or review his previous statement in advance of the PPD recorded statement in complete abrogation of due process.

55. During the hours long PPD interview, the investigator repeatedly used the transcript from James' previous recorded statement to "trip him up" and create minor discrepancies in his testimony- which the PPD later used for its finding of dishonesty as a pretextual basis for James's termination.

56. During the PPD interview, James was asked repeated and detailed questions about the nature and extent of his interracial relationship with the ex-girlfriend (including questions about their dating habits and how often they saw each other) and his use of the ADSI system to look up her residence.

57. During the PPD interview, the investigator also asked James about alleged complaints

from years in the past, of which he had no prior knowledge, in an obvious attempt to find

pretextual reasons to move forward with his termination despite the ISPD finding no basis to

terminate James.

58. Following his recorded statement to the PPD, James was instructed the Chief would get

back to him in a few weeks.

59. In the weeks following his interview/statement, James was relocated to a new residence

as part of the Resident Police Officer Program.

60. During the weeks following the interview/statement, James learned of allegations/rumors

within the PPD that he was dealing drugs (he was not and was never investigated for this) and

statements were made to his new co-residents by PPD officers that they were "trying to get rid of

James but had to be careful."

61. On or about January 14, 2022, James' Captain notified James that he was being

placed on administrative leave with pay for one week.

62. On or about January 21, 2022, James was called into the PPD office by his Captain who

indicated he was prepared to terminate James when he reported to work on Monday, January 24,

2022.

63. On January 24, 2022, James was notified of his termination based on the pretextual

reasons of: failure to take proper action, unauthorized use of the local criminal database ADSI

system, and discrepancies in his two recorded statements.

64. The PPD investigation process was a sham devoid of any semblance of due

process and the outcome was pre-ordained before it was opened and was exclusively meant to

manufacture a pre-textual basis for James' race-based termination.

**PRETEXT AND DAMAGES**

65. The use of the ADSI system to investigate the background of personal relations was prevalent amongst members of the PPD- in fact, multiple superiors instructed James to look up girls he dated to make sure they did not have a criminal record and, as part of the Resident Police Officer Program, to look up local residences around him to "know" the area he was working.

66. James ADSI history showed that he had looked up the residence in question prior to his relationship with his ex-girlfriend because he had responded to calls there for domestic disturbances.

67. Upon information and belief, no other officer has been terminated in relation to unauthorized use of the ADSI system.

68. While the ADSI system is a local criminal database, its federal/national equivalent is the LEADS system. Unlike the ADSI, unauthorized use of the LEADS system is strictly prohibited and carries the potential for severe punishment. Despite this, at least one white female police officer at the PPD who was found to have used the LEADS system for unauthorized, personal use; yet she received only a 3-day suspension and was not terminated.

69. Additionally, the allegation of "discrepancies" in James' recorded statements is mere pretext for his termination. James was subjected to hours of interrogation about the same information months apart- without the benefit of review of his prior statement before his PPD interview. The PPD's unilateral use of his prior statement was intentionally done to "trip" James up and create minor inconsistencies to establish pretext for his termination.

70. While James was repeatedly questioned and scrutinized over his personal relationships

with women of different races, during that same period other white PPD officers were discovered to be engaged in same-race romantic relationships with police recruits and/or PPD police officers they supervised in direct violation of PPD policy without discipline or termination.

71. The reasons stated for James' termination were mere pretext and the real motive for his termination was his race.

72. This amounts to discriminatory conduct in violation of Illinois state and Federal laws.

73. The PPD acted under the color of law.

74. PPD has a policy, custom, and/or pattern and practice of subjecting African American employees to a hostile work environment and other discriminatory treatment based on their race and disciplining and/or terminating officers based on race.

75. PPD's actions were willful, wanton, malicious and in reckless disregard to James' constitutional and statutory rights.

76. As a result of PPD's conduct, James has been harmed by this discriminatory conduct in the form of lost wages and benefits in the past and future, irreparable harm to his reputation which has prevented him from employment in other law enforcement positions for which he is qualified, severe emotional distress and mental anguish, humiliation, degradation, emotional pain and suffering, and other damages.

## Count I
## Violation of Plaintiff's 14th Amendment Rights and 42 U.S.C. §1983
## (Hostile Work Environment, Harassment and Discrimination on the Basis of Race)

77. Plaintiff restates and incorporates paragraphs 1-76 as though fully set forth herein.

78. By the actions described above, PPD has violated James' rights under the Fourteenth Amendment and 42 U.S.C. §1983.

WHEREFORE, PLAINTIFF respectfully prays:

a.  That PPD, upon a trial by jury, be adjudicated to have violated Plaintiff's constitutional rights under the Fourteenth Amendment of the U.S. Constitution and Section 1983;

b.  That Plaintiff be reinstated at the position he would have been in but-for the discrimination;

c.  That this incident, and everything incidental to it, be removed from Plaintiff's personnel record;

d.  That PPD be enjoined from subjecting African American employees, including Plaintiff, to a hostile work environment, harassment, or discrimination based on race;

e.  That Plaintiff be awarded damages for all past and future lost wages, benefits, and other pecuniary losses, as well as appropriate compensatory damages for all emotional pain and suffering, humiliation, damage to reputation, degradation, and/or any other tangible or intangible damages;

f.  That Plaintiff be awarded punitive damages;

g.  That Plaintiff be awarded prejudgment interest;

h.  That Plaintiff be awarded his reasonable attorney's fees, costs, and expenses, and;

i.  That the Court grant Plaintiff such other and appropriate further relief as it deems just and reasonable under the circumstances.

## Count II
## Violation of Title VII
## (Hostile Work Environment, Harassment, and Discrimination on the Basis of Race)

79. Plaintiff restates and incorporates paragraphs 1-76 as though fully set forth herein.

80. By the actions described above, PPD has violated Plaintiff's rights under Title VII.

WHEREFORE, Plaintiff respectfully prays:

a.  That PPD, upon a trial by jury, be adjudicated to have violated Plaintiff's constitutional rights under Title VII;

b.  That Plaintiff be reinstated at the position he would have been in but-for the discrimination;

c.  That this incident, and everything incidental to it, be removed from Plaintiff's personnel record;

d.  That PPD be enjoined from subjecting African American employees, including Plaintiff, to a hostile work environment, harassment, or discrimination based on race;

e.  That Plaintiff be awarded damages for all past and future lost wages, benefits, and other pecuniary losses, as well as appropriate compensatory damages for all emotional pain and suffering, humiliation, damage to reputation, degradation, and/or any other tangible or intangible damages;

f.  That Plaintiff be awarded punitive damages;

g.  That Plaintiff be awarded prejudgment interest;

h.  That Plaintiff be awarded his reasonable attorney's fees, costs, and expenses, and;

i.  That the Court grant Plaintiff such other and appropriate further relief as it deems just and reasonable under the circumstances.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.**

Dated: _____March 11, 2024_____          Respectfully Submitted,

/s/ Patrick E. Poston

Patrick E. Poston, Mo 69926; IL 6306753
The Law Office of Patrick E. Poston, LLC
5661 Telegraph Road, Suite 8B
St. Louis, MO 63129
(314) 943-7597
pposton@peplawoffice.com

*Attorney for Jerry W. James*